AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

**FILED**
United States District Court
Albuquerque, New Mexico

# UNITED STATES DISTRICT COURT
### for the
### District of New Mexico

Mitchell R. Elfers
Clerk of Court

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>9000 ZUNI ROAD SE, TRAILER E12,<br>ALBUQUERQUE, NEW MEXICO, 87123 | )<br>)<br>)<br>)<br>)<br>) |

Case No.   **22mr1759**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
9000 ZUNI ROAD SE, TRAILER E12, ALBUQUERQUE, NEW MEXICO, 87123 as described in Attachment A

located in the _____ District of ____New Mexico____ , there is now concealed *(identify the person or describe the property to be seized)*:
See attachment B incorporated herein for reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 U.S.C. § 1324 | Bringing in and harboring certain aliens |
| 18 U.S.C. § 1203 | Hostage Taking |

The application is based on these facts:
See attached Affidavit incorporated herein for reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under
18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Sean Murphy, HSI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
____Telephone____ *(specify reliable electronic means).*

Date:   November 29, 2022

*Judge's signature*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE PREMISES LOCATED AT 9000 ZUNI ROAD SE, TRAILER E12, ALBUQUERQUE, NEW MEXICO, 87123 | Case No. _____<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Sean Murphy, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

I, your affiant, make this affidavit in support of an application for a search warrant under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as 9000 Zuni Road SE, Trailer E12, Albuquerque, New Mexico, hereinafter "TARGET PREMISES" further described and depicted in Attachment A, for the things described in Attachment B.

Your Affiant is a Special Agent with the Department of Homeland Security, Homeland Security Investigations, hereafter referred to as HSI, and has been employed by HSI since November of 2018. Your Affiant is currently assigned to the HSI office in Albuquerque, NM where your Affiant is assigned to investigate individuals involved in the trafficking of people including violations of Title 18, United States Code, Section 1591 and 1592 as well as human smuggling in violation of Title 8, United States Code, Section 1324. Your Affiant has worked human trafficking investigations and human smuggling investigations and has training in investigating these types of cases by the Department of Homeland Security and other governmental and non-governmental entities. During the investigation of these cases, your Affiant has participated in the execution of search warrants pertaining to these violations.

Your Affiant has completed the Criminal Investigator Training Programs at the Federal Law Enforcement Training Center. This program addressed general investigatory topics over the span of twelve weeks. Your Affiant also completed 15 weeks of the Homeland Security Investigations Special Agent Training Program. Prior to employment with Homeland Security Investigations, your Affiant worked for the Elkton Police Department in Elkton, Maryland for over ten years. During that time, your Affiant conducted investigations into a wide array of offenses including but not limited to drug offenses, prostitution, human trafficking, rape, robbery, child abuse, child sexual abuse, aggravated assault, and homicide. During these investigations, your Affiant authored and served numerous search and seizure warrants, as well as arrest warrants, for the aforementioned crimes. Your Affiant possesses a baccalaureate degree in Psychology from Lee University in Cleveland, Tennessee and a graduate degree in Homeland Security Management from Towson University in Towson, Maryland.

In addition to my training and experience, I have developed information I believe to be reliable from additional sources including, but not limited to:

  a. Information provided by Special Agents ("SA"), Intelligence Research Specialists (IRS) of the Department of Homeland Security, and other law enforcement officials ("Agents"), including oral and written reports that I have received directly or indirectly from said investigators;

  b. Sources of Information (SOIs)

  c. Results of physical surveillance conducted by agents during this investigation;

2

          d.   A review of telephone toll records and subscriber information;

          e.   Information derived from consensually recorded conversations;

          f.   A review of driver's license and automobile registration records;

          g.   Records from commercial databases; and

          h.   Records from the National Crime Information Center ("NCIC").

Because this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are relevant to the determination of probable cause to support the issuance of the requested warrant. When the statements of others are set forth in this Affidavit, they are set forth in substance and in part.

Based on the facts set forth in this Affidavit, there is probable cause to believe that violations of 8 U.S.C. § 1324 and 18 U.S.C § 1203, have been committed, are being committed, and will continue to be committed using the TARGET PREMISES.

The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offenses being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## RELEVANT CRIMINAL STATUTES

I believe there is probable cause that the SUBJECT has committed, are committing, and will continue to commit offenses involving violations of:

8 U.S.C. § 1324 – Bringing in and harboring certain aliens

18 U.S.C § 1203- Hostage Taking

## EVIDENCE SOUGHT DURING SEARCH

Based on my training, experience, and participation in this and in similar investigations, I believe that individuals involved in human smuggling of undocumented citizens often conceal evidence of their activities in their residences and businesses, or the residences of friends or relatives, and in surrounding areas to which they have ready access such as garages, carports and outbuildings. They also conceal evidence in vehicles, including vehicles outside of their residences and businesses, so that they have ready access to it and so that they can hide it from law enforcement, including law enforcement officers executing search warrants at their residences or businesses. Evidence also may be found in other areas to which a human smuggler has ready access, such as rented storage areas and safety deposit boxes, or buried underground on their property. This evidence, which is discussed in detail in the following paragraphs, includes undocumented persons hiding in storage sheds or outbuildings, items typically found in possession of undocumented persons such as fraudulent forms of identification, foreign currency, fraudulent immigration documents, records, human smuggling stash house secondary locations, proceeds from human smuggling, and valuables obtained from proceeds.

Human smugglers often travel domestically and internationally to facilitate their human smuggling efforts. Evidence of foreign and domestic travel by persons engaged in illegal human smuggling includes travel itineraries, airline tickets, receipts, passports, and visas. These items

are stored by human smugglers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of relatives and in cars. Many of these items are accessible via the internet and can be downloaded and saved on a computer or digital media and on storage media. The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones. The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium.

Human smugglers often use storage facilities for items related to human smuggling and human trafficking that are at a location away from their residences and businesses. These off-site storage facilities are often commercial storage lockers and rooms. These locations are often used to store or hide people, the personal belongings of illegally smuggled undocumented non-citizens, money, fraudulent documents, and valuables obtained through their illegal proceeds. Human smugglers often keep documents and other items tending to show the existence of other fraudulent documents, materials used to produce fraudulent documents, and valuables obtained through illegal proceeds in areas such as storage facilities. Those documents and other items include rental agreements, receipts, keys, notes, and maps specifically concerning off-site storage rooms, routes to additional "human stash houses" or "safe houses", lockers, and safety deposit boxes. This evidence may be found on their person or in their businesses, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars. This type of documentation can be stored on digital media and concealed virtually anywhere.

5

Evidence of significant, unexplained income of human smugglers, or for the acquisition and concealment of money and assets of human smuggling efforts, can be found on banking and investment account statements, credit card account statements, canceled checks, money orders, deposit slips, check and savings books, business and personal ledgers, accounting records, safe deposit box records and keys, federal and state tax records, rental receipts, rental agreements, utility bills, overnight mail receipts, telephone bills, loan statements records reflecting ownership of real or personal property (such as deeds of trust or vehicle registration, insurance, and ownership information), vehicle and property rental records, lease and purchase agreements, and canceled mail. These records can be maintained on paper, but also can be maintained as electronic data on computers and other digital media. The above items are typically kept by human smugglers on their person or in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and vehicles.

The use of digital media, including smartphones, tablets, cellular phones, and digital devices, has become part of everyday life. This is also true for human smuggling organizations. Information stored in electronic form on all of the above devices can provide evidence of human smuggling and/or drug trafficking. Human smugglers frequently use some or all of these devices to communicate with co-conspirators, and others involved in the human smuggling trade. These communications include, but are not limited to, phone calls, text messages, SMS (Short Message Service) messaging, MMS (Multimedia Messaging Service) messaging, social media posts and messaging, and smartphone application messaging services. Smartphones, tablets, cellular phones, and digital devices are frequently capable of storing messages, emails, social media communications, and communications made over smartphone applications. The content of these communications will often provide evidence of human smuggling. Numbers stored on a

6

telephone (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and incoming calls) can provide evidence of who the human smuggler is calling, and thus the identity of potential associates.

Human smuggling organizations often maintain firearms and ammunition on their person or in their homes, businesses or cars to protect themselves, the undocumented persons they are smuggling into or across the United States, their associates, and their profits. They also may maintain indicia of firearms such as receipts for firearms and ammunition, boxes for firearms and ammunition, firearms cleaning supplies, and instruction manuals and other documentation for firearms and ammunition. I know that weapons (including rifles, shotguns, and handguns) are tools of the trade for human smugglers, who often keep firearms in close proximity to themselves and their contraband to protect them from other smugglers and law enforcement.

Documents showing who owns, occupies, or controls the location being searched also show who is responsible for the items found on the premises, including contraband, undocumented persons, and other evidence seized. Documents and items showing the identity of the persons owning, residing in, or controlling the area being searched include, but are not limited to, utility and telephone bills, canceled envelopes and correspondence, outgoing answering machine messages, tax returns, keys, deeds and mortgage receipts. These documents may also be produced on computers, downloaded from online accounts or scanned into digital format and stored on computers and related digital media.

Based on my training and experience, particularly my experience relating to the investigation of properties such as the one listed in Attachment A, I know that it is common for human smugglers in such areas to keep evidence of their crimes throughout their properties. I further know that all of the evidence described above could be located not only in the main

7

residence, adjoining or adjacent building sharing the same property, but also in garages,
outbuildings, storage containers, safes, safety deposit boxes, sheds, barns, vehicles, and even
buried in the ground.

## COMPUTERS, ELECTRONIC STORAGE AND FORENSIC ANALYSIS

As described above and in Attachment B, this application seeks permission to search for
evidence and records that might be found on the property of the TARGET PREMISES in
whatever form they are found. Much of the evidence and records described in the paragraphs
above, and in Attachment B, can also be produced and/or stored on computers, digital media and
other storage media, such as computer hard drives, external hard drives, thumb drives, secure
digital cards and other types of flash memory cards, compact disks and floppy disks, personal
digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads,
digital cameras, and cellular telephones. For this reason, I submit that if a computer aided digital
medium or storage medium is found on the property of the TARGET PREMISES, there is
probable cause to believe those records will be stored on that computer or storage medium. Thus,
the warrant applied for would authorize the seizure of electronic storage media or, potentially,
the copying of electronically stored information, all under Rule 41(e)(2)(B). Because several
people appear to share the TARGET PREMISES, it is possible that the TARGET PREMISES
will contain storage media that are predominantly used, and perhaps owned, by persons who are
not suspected of a crime. If it is nonetheless determined that it is possible the things described in
this warrant could be found on any of those computers or storage media, the warrant applied for
would permit the seizure and review of those items as well.

*Necessity of seizing or copying entire computers or storage media.* In most cases, a
thorough search of a premises for information that might be stored on storage media often

8

requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

*The time required for an examination.* As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

*Technical requirements.* Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

9

*Variety of forms of electronic media.* Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

*Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying of computers, cellular devices, and/or storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the computer or entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## PROBABLE CAUSE

On November 27, 2022 at approximately 1150 hours, Detective H. Marquez #5437 of the Albuquerque Police Department VICE Unit was contacted via telephone by Officer J. Osborne #7202 regarding a call for service in the Valley Area Command. Detective Marquez is also a Task Force Officer with Homeland Security Investigations.

Upon reviewing the remarks on the call for service, Detective Marquez discovered that The National Human Trafficking Hotline Center had received an anonymous tip from a male stating his friend, identified for purposes of this document as Female Victim 1 (FV1) was kidnapped in the process of being smuggled into the country from Mexico. The anonymous source stated they had received texts from FV1 stating the offenders were making threats to sexually abuse and kill her if the anonymous caller did not provide the smugglers with money. FV1 had advised the anonymous source she was in Albuquerque for approximately two weeks

10

and was in the area of 1000 Trumbull Ave SE. She had stated it was in "Trumbull Village". FV1 reported to the anonymous caller that the offender was known was as "La Rey" with telephone numbers of (760) 556-5227, (951) 470-9480, and 52 932-111-6558. It was unknown how FV1 had obtained this information and how the anonymous source was provided the direct information. The National Human Trafficking Hotline Center contacted the Albuquerque Police Department and provided the tip (case#0130-662) to be investigated.

Detective Marquez contacted the National Human Trafficking Hotline Center directly in attempt to obtain further information or to see if he could obtain the anonymous caller's information to speak with them directly. Detective Marquez spoke with an operator at the NMHT Center who verified the tip that was called in and provided affiant with the same information. The operator advised they did not have any information on the anonymous caller other than it was male who provided the information.

Based on his training and experience, Detective Marquez knows that person(s) that are illegally smuggled into the country by criminal organizations are commonly victimized and harmed throughout the process of being brought into the United States of America. Due to the information provided by the anonymous source to the NMHT Center regarding FV1, an exigent ping was requested from the telephone provider for the telephone number of (760) 556-5227, hereafter referred to as SUSPECT PHONE.

Detective Marquez received the ping cell site data and observed it to be in the area of Kirtland Airforce Base, 310 Virginia St SE, and Eubank SE/ Innovation SE which appeared to be

11

consistent with cell phone tower pings at or near those locations. It did not provide an exact or approximate location for law enforcement to check for FV1's whereabouts.

Using Law Enforcement Databases Detective Marquez was able to obtain subscriber information for SUSPECT PHONE through Metro PCS as Charlotte Reyna with an address of 824 San Pedro Dr SE. Surveillance was set up at the residence of 824 San Pedro Dr SE, prior to patrol officers being sent to the residence to make contact with the occupants. Patrol officers made contact at the residence and discovered that Charlotte no longer resided at the address.

On 11/28/2022, through a law enforcement database, your Affiant discovered that a subject with the same name as FV1 had been contacted by United States Border Patrol on November 9th, 10th, 12th, and 14th of 2022 in the State of New Mexico. Your Affiant also noticed these dates were approximately 2 weeks prior to the tip being made which alleged that the victim was kidnapped 2 weeks prior. FV1 was not retained in custody by Border Patrol. A photograph of FV1 was obtained.

Further review of the initial tip indicated that there were multiple suspects and potentially 80 other possible victims.

On 11/28/2022, law enforcement databases revealed information that the SUSPECT PHONE was linked to a money transfer made on 09/04/2022. In that transaction, money was sent from a subject in California to a subject named Yudi QUINONEZ-CAMPOS. The information provided on the money transfer listed the SUSPECT PHONE with an address of 9000 Zuni Road SE, E12, in Albuquerque, NM. Through further research, your Affiant discovered the address was within the Trumbull Village section of Albuquerque.

12

On 11/28/2022 at approximately 1546 hours, your Affiant responded to 9000 Zuni Road SE, Trailer E12, in Albuquerque, NM. As your Affiant was arriving to the location, a dark colored Toyota Sequoya bearing California registration 9CQE659 was departing the residence. Your Affiant conducted mobile surveillance on the vehicle. Your Affiant observed the vehicle, which was driven by a male later identified as Rolando Joaquin-Miguel, pull into the parking lot of Home Depot located at 200 Eubank Blvd SE in Albuquerque, NM. The vehicle parked but no one entered or exited the vehicle. After several minutes, the vehicle traveled through the parking lot to the adjoining parking lot of Costco located at 500 Eubank Blvd SE in Albuquerque, NM. The vehicle moved to 3 different parking spaces in the Costco parking lot, each for short durations. After several minutes, the vehicle exited the Costco parking lot and traveled back to 9000 Zuni Road SE, Trailer E12.

Moments later your Affiant received a call from Detective Marquez. Detective Marquez advised that the ping location data moved to the Costco at 200 Eubank Blvd. SE, with an accuracy of approximately 719 meters, then returned to the previous ping location, which was roughly in the area of Virginia St. SE and Virginia Ct. SE in Albuquerque, NM with an accuracy of approximately 488 meters. This intersection is roughly 2 blocks from the trailer park located at 9000 Zuni St. SE in Albuquerque, NM. The change in location data coincided with the observations made by your Affiant, leading him to believe that the SUSPECT PHONE was in the dark colored Toyota Sequoya bearing California registration 9CQE659 being driven by the subject later identified as Rolando Joaquin-Miguel.

At that point, HSI Special Agents and Detectives from the Albuquerque Police Department established continuous surveillance on 9000 Zuni St. SE, Trailer E12 in Albuquerque. At approximately 1852 hours, Agents observed approximately 9 people exit the

13

residence in small groups. The subjects got into a white colored Toyota Sequoia bearing

California registration 7RTL206 which had just arrived. After the subjects got into the vehicle,

the vehicle departed. The vehicle traveled to a parking lot across from 9000 Zuni St. SE, in

between Zuni St. and Central Ave. In that parking lot, the vehicle met with a dark colored

Mazda bearing California registration 7YKZ940. The driver of the Toyota exited and got into

the Mazda. A passenger from the Mazda exited the vehicle and got into the driver seat of the

Toyota. The vehicles then parted ways. Agents focused their attention on the Toyota Sequoia

bearing California registration 7RTL206.

Through training, knowledge, and experience, Agents knew that the activity they

observed, coupled with the information from the anonymous tip, was consistent with alien

smuggling. As a result, a vehicle stop was executed on the white colored Toyota Sequoia

bearing California registration 7RTL206 in the area of I-40 and Wyoming Blvd. in Albuquerque,

NM. Upon making contact with the vehicle, Agents observed 10 people inside the vehicle, two

of whom were laying, curled up, on the floor of the cargo area in the rear of the vehicle. Agents

also recognized this to be consistent with alien smuggling activity. As a result, all occupants of

the vehicle were asked to exit the vehicle. Subsequent investigation revealed that none of the 10

individuals in the vehicle had legal status in the United States of America and were present in the

United States illegally. All 10 individuals were detained and transported back to HSI

Albuquerque.

Interviews of the occupants of the Sequoia revealed there were approximately 30-50

additional aliens, including 2-4 minor children with some under the age of 10, still inside of

Trailer E12 at 9000 Zuni. Agents were also made aware the person "operating" Trailer E12 was

using threats of physical harm, forced labor, and coercion to make sure the occupants did not flee

14

or leave or residence.   Agents, along with members of the Albuquerque Police Department responded back to that address.  The residence had been under constant surveillance even during the vehicle stop.  Bearing in mind the information concerning possible hostage taking occurring, as well as the presence of juveniles within the residence, Agents conducted a knock and talk operation.  Upon Agents knocking on the door, Rolando Joaquin-Miguel was observed looking out the large window that faces the street.  He then disappeared from sight behind the curtain which was covering the window.  Suddenly Agents heard loud noises coming from the trailer which sounded like a large number of people running or moving large objects, possibly in an attempt to barricade themselves.  As the sounds were heard, Agents observed rattling of the some windows and the door of a secondary entrance consistent with excessive movement within the residence.  Concerned that aliens were being concealed withing the residence and potentially at risk of being harmed, Agents made entry into the residence and immediately observed a large number of people contained within.  Approximately 60 people were encountered inside the residence.  Subsequent investigation revealed that none of them had legal status within the United States the individuals were detained.  Among those detained was Rolando Joaquin-Miguel.  These individuals were transported back to HSI Albuquerque.  In plain view, Agents observed a large bag of cellular phones.  Agents recognized this through training and experience as a tactic used by smugglers to isolate their victims while extorting their families for ransom payments.

As Agents were removing people from the residence, Det. Marquez recognized an individual who appeared to be FV1 from the photograph obtained from the Border Patrol contact.  FV1 was asked her name and she provided the same name previously provided by the tipster.  Furthermore, as agents removed people from the location, two females, hereinafter

15

referred to as Female Victim 2 (FV2) and Female Victim 3 (FV3) were visibly shaking with fear. FV2 was shaking and visibly crying as she put a finger to her lips to signal agents to be quiet; agents believed FV2 was fearful of retaliation from someone inside of the location as she kept pointing to her front pocket. Agents realized FV2 had a cell phone in her pocket that Joaquin-Miguel was unaware of.

Agents removed FV2 away from the trailer out of view of Joaquin-Miguel. FV2 stated she was in fear for her life and the life of FV3. FV2 advised her and FV3 had been held captive at the trailer for over a month and they were beaten and threatened by Joaquin-Miguel. FV2 said she was supposed to be transported west from Albuquerque after a family member paid $11,000 for her and FV3 to be smuggled into the United States. FV2 stated Joaquin-Miguel threatened to harm FV3 if FV2 ever left the location or fled. FV2 said Joaquin-Miguel would try to keep FV2 and FV3 separated and only allowed them to be together if he was with them. FV2 stated Joaquin-Miguel allegedly forced her and FV3 to cook for him, his drivers, and the occupants of the trailer. When FV2 initially refused to cook for Joaquin-Miguel, she said he withheld food from FV2 and FV3 and forced them to sleep on the floor by the front door with no blanket. FV2 told agents she didn't want to starve or be abused, so she agreed to cook and clean for Joaquin-Miguel. FV3 stated she had been at the location for approximately a month with FV2. FV3 said she was forced to cook and clean for Joaquin-Miguel under threats of violence. FV3 told agents she was never physically hit by Joaquin-Miguel, but she was unwantedly slapped on her buttock's multiple times in a sexual manner by two different male associates of Joaquin-Miguel.

FV2 and FV3 stated none of the females inside of the location were provided with feminine hygiene products and they all needed to smuggle in whatever they could use. On the rare occasion they were able to convince one of Joaquin-Miguel's associates to provide them with

16

hygiene products, FV3 said she would hoard the items so she could provide whatever she could to incoming females from Guatemala and Mexico.

At HSI, your Affiant and Det. Marquez conducted an interview with FV1. FV1 advised he/she had been in the trailer for approximately 15 days. She stated that members of the smuggling organization would come to the trailer, become intoxicated, then demand that the females inside the trailer dance provocatively for them. FV1 stated that the members of the smuggling organization would then grope the women under their clothing in their breast and genital area, while forcing kisses. FV1 advised that this included the underage girls who were brought to the residence. FV1 advised that she once told one of the members of the organization to stop groping an underage girl and was struck in the face for doing so. FV1 advised he/she was told to call their significant other and demand that they pay money to secure their release. FV1 advised that this call was made from the phone belonging to Rolando JOAQUIN-MIGUEL. FV1 stated that JOAQUIN-MIGUEL spoke to her significant other and advised that he would murder FV1 by cutting off her head if payment was not made. FV1 was later able to ascertain that a payment had been made but she was still not released. FV1 advised that JOAQUIN-MIGUEL demanded that they clean the residence and cook food for the members of the smuggling organization. FV1 stated that the women would be punished if this work was not performed. The punishment took form of withheld food, the denial of blankets, and having to sleep directly on the floor. FV1 stated that he/she had seen aliens be physically assaulted by members of the smuggling organization. FV1 stated that the aliens in the house were fed 1 meal per day and were not allowed to leave. FV1 advised that one of the members of the smuggling organization sexually assaulted her by way of digital penetration. She advised that he was rough about it and hurt her genital area. She advised that the subject who sexually assaulted her was

17

not at the residence at the time of law enforcement intervention.  She provided the nickname of "el Terco" and described him as a Guatemalan male who was approximately 32 years old.

FV1 advised that the conditions of the residence and treatment of the individuals was so traumatic for her that she was hoping she would die.

## CONCLUSION

Based on the information and facts set forth in this affidavit, I believe the occupants of the TARGET PREMISES are in violation of Title 8 United States Code, Section 1324, Title 18 United States Code, Section 1203, and are using or have used the TARGET PREMISES in furtherance of these crimes.

Agents have observed and corroborated specific articulable facts consistent with human smuggling, statements, and facts consistent with hostage taking, and corroborated information provided to them by FV1, FV2, and FV3, as well as observations by investigators conducting physical surveillance, and information through cell phone subscriber data and ping locations.

Considering the facts set forth in this affidavit, there is probable cause to believe violation of Title 8 United States Code, Section 1324 and Title 18 United States Code, Section 1203 have been committed, are being committed, and will continue to be committed by the occupants of the TARGET PREMISES. Furthermore, I submit there is probable cause to believe the occupants will continue utilizing the TARGET PREMISES in furtherance of human smuggling related offenses.

Thus, I respectfully request that a warrant be issued authorizing Homeland Security Investigations, with appropriate assistance from other law enforcement officers, to enter the said premises, to include its surrounding storage sheds, vehicles, storage structures, and outbuildings on the property described in ATTACHMENT A, to search for, seize, and examine the items

18

and/or assets set forth above and in ATTACHMENT B.

(Continued on following page)

AUSA Letitia Simms reviewed and approved this affidavit.

Respectfully submitted,

Sean Murphy
Special Agent, HSI

Electronically submitted and telephonically sworn on November 29th, 2022:

HONORABLE LAURA FASHING
UNITED STATES MAGISTRATE JUDGE

19

## ATTACHMENT A

The TARGET PREMISES is located at 9000 Zuni Rd. SE, Trailer E12, Albuquerque, NM. The premises is a trailer described as unit E12.  The structure is brownish tan in color with white flashing at the bottom.  The front door to the residence is white in color.  A porch with a white railing leads up to the front door.  The numbers "12," which are painted the same brownish tan color as the structure are displayed on the corner of the residence facing the roadway.

## **ATTACHMENT B**

## **ITEMS TO BE SEARCHED AND/OR SEIZED**

1.  Illegally smuggled or undocumented persons.

2.  Large amounts of currency, financial instruments, precious metals, jewelry and other items of value and/or proceeds of human smuggling transactions.

3.  Any and all customer lists, lists of human smuggling payees, lists of persons to be smuggled or lists of persons who have been smuggled illegally into the United States, travel records, smuggler records, or any notes containing the individual names of such persons, telephone numbers, addresses of these customers or other persons to be illegally smuggled, and any corresponding records of accounts receivable, money paid or received, or cash received to pay for human smuggling or intended to pay for human smuggling efforts.

4.  Telephone and address books or notes containing telephone numbers and addresses of co-conspirators.

5.  Telephone toll records for homes and/or businesses owned or controlled by suspected co-conspirators, or other communication devices used by them and/or their human smuggling associates.

6.  Messages, notes, correspondence, and/or communications between human smugglers and their co-conspirators.

7.  Any and all financial or other instruments evidencing placement of assets in the names other than the names of the human smugglers themselves.

21

8. Books, records, receipts, diaries, notes, ledgers, airline tickets; cashier's checks, money orders and other papers relating to the transportation of suspected undocumented non-citizens.

9. Firearms and ammunition, including handguns, rifles, shotguns and automatic weapons.

10. Any and all computers, cellular devices, digital media, and storage media that reasonably appear to contain some or all of the records, information, and/or evidence described in Attachment B. As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data).